MULHOLLAND *v.* KELSEY.

1. TROVER AND CONVERSION—CHATTEL MORTGAGES—SALES—CONTRACTS.

There was evidence of conversion, in an action of trover for the value of a livery stock which plaintiff, after purchasing of defendant, giving him a mortgage back and paying a part of the indebtedness, turned back to the defendant upon his agreement to run the business for the proceeds, and, as soon as he could do so, sell it and pay the surplus remaining, after satisfying the debt, to the plaintiff, but which, in defiance of the agreement, defendant took, claiming absolute title from the time he obtained possession.

2. SAME—EVIDENCE—OPINION EVIDENCE.

It was error to permit a witness to testify as to the comparative value of the property, at different times, where he did not show that he was acquainted with its value at any time.

3. SAME—PROFITS—DAMAGES—SPECULATIVE EVIDENCE.

Testimony concerning the profits of the business, made while defendant conducted it, was too speculative and uncertain to afford evidence of its value.

Error to Ingham; Collingwood, J. Submitted April 18, 1911. (Docket No. 89.) Decided June 2, 1911.

Trover by Homer G. Mulholland against John Kelsey. Judgment for plaintiff. Defendant brings error. Reversed.

*C. P. Black* and *S. B. Roe*, for appellant.

*Gardner & Hood*, for appellee.

BLAIR, J. This is an action of trover brought by the plaintiff against defendant to recover for the conversion of a livery stock. In August, 1906, plaintiff purchased this livery stock from one Mott for $2,000, paying $400 down. Defendant, Kelsey, a livery man of long experience, held a chattel mortgage on the property given by Mott for $1,400, and took charge of the business for plaintiff temporarily. By applying profits made, he reduced plaintiff's indebtedness to Mott to $1,380.83, and on December 12, 1906, a new arrangement was made, whereby Mott's indebtedness to Kelsey was discharged, the mortgage canceled, and a new note and mortgage for $1,380.83 executed by plaintiff to defendant. Thereafter plaintiff carried on the business till December 23, 1907, when he turned it over to defendant under an agreement, as he testified, that Kelsey was to take charge of the livery stock and conduct the business for the profits until an opportunity arose to dispose of it for what it was worth, when he was to sell it, take out $740 due him on the note and mortgage, and pay the remainder over to plaintiff, in whom the title was to remain till the sale.

"But there was not a stated amount; that is, stated figure that the barn should be sold for, only it was to be sold for the best possible price. Mr. Kelsey was to sell it at any decent figure. He was to exercise his own judgment as to the fairness of the price. He knew what this stock was worth, and he knew what it ought to be sold for and he did sell it. But he anyway had authority to go on and sell the stock at the best possible price. There was no

fixed figure at which the property should be sold, nor date fixed upon when property was to be sold. The title was to remain with me. Kelsey had the privilege of selling it."

The defendant testified that the transaction was an absolute sale to him of the stock for the amount of plaintiff's indebtedness, that he surrendered the note and discharged the chattel mortgage, and became the absolute owner of the property.

The circuit judge instructed the jury that, if they found defendant's version of the transaction to be correct, plaintiff was not entitled to recover, but that, if they found the agreement to be as testified by plaintiff, then defendant was guilty of a conversion of the property at the time the stock was turned over to him, and they should ascertain plaintiff's damages.

" You will find then from the evidence in this case the value of that stock at that time taking everything into consideration, and you will find the amount due Mr. Kelsey on that mortgage. You will then deduct the one from the other, and that will be Mr. Mulholland's damage, and he will be allowed on that 5 per cent. interest."

The jury returned a verdict for plaintiff of $985.62.

Defendant relied upon the following points:

"(1) Under the undisputed evidence the action of trover was not the plaintiff's remedy.

"(2) If trover could be maintained, there was no legal evidence outside of that offered by the defendant that tended to show the market value of the property in question at the date of the conversion as claimed by the plaintiff.

"(3) The undisputed evidence offered in the case as to the value of the property at the alleged date of conversion showed that the value was less than the amount due the defendant.

"(4) The court erred in permitting the plaintiff to fix upon an erroneous basis for proving the market value of property at the time of the alleged conversion.

"(5) The court erred in admitting and rejecting evidence over the objection of defendant's counsel.

"(6) The court erred in refusing to direct a verdict for defendant on defendant's motion at the close of the case.

"(7) The court erred in its charge to the jury."

1. This raises the principal question in the case. We agree with the circuit judge that the defendant's testimony proved him guilty of conversion, if the jury should accept plaintiff's version of the agreement. The defendant testified:

"* * * Your claim is, is it, Mr. Kelsey, that at the time you took that property from Mulholland, December, 1907, immediately when you went into possession you became the absolute owner of that property, is it?

"A. Yes, sir.

"Q. And you have claimed to be the owner ever since?

"A. No; not ever since.

"Q. Up to the time you sold?

"A. Yes. * * *

"Q. You claim that you bought the stock from Mr. Mulholland for the debt?

"A. I do.

"Q. And immediately, when you took possession of it, you claimed absolutely the title in you?

"A. I did.

"Q. And you also claimed that you had a right to do with that property whatsoever you wished?

"A. Yes, sir.

"Q. And you from that moment did not recognize that Mr. Mulholland had one cent of interest in that property?.

"A. Not one penny.

"Q. And that has been your attitude ever since you took possession of that property?

"A. Yes, sir."

It is apparent from defendant's own testimony and from that of others that defendant never for an instant held this property as the property of plaintiff, to be sold at the first opportunity for the plaintiff's benefit. On the contrary, he secretly held it from the outset in defiance of his agreement and with the settled determination to deprive plaintiff wholly of it and apply it wholly to his own use. He intended to convert the property to his own use at the time he obtained the possession, and could predicate no rights whatever as against plaintiff upon such fraudulent possession. *People* v. *Hanaw*, 107 Mich. 337 (65 N. W. 231); *Iler* v. *Baker*, 82 Mich. 226 (46 N. W. 377).

2. At the time plaintiff purchased the stock in August, 1906, defendant told him "that he did not think the stock was worth over $1,800, or it ought to be bought for that." Plaintiff testified that he added to the property bought of Mott other property of the value of $763.50. The witness Miller testified that defendant told him that he was offered $1,300 for the stock, leaving out the horse "Sam R," worth $200, and would not take it. Speaking of the man who made the offer, he said:

"He don't know this stock is worth just as much to-day as it was the day Mulholland bought it."

The witness Osborne testified:

"I called on Mr. Kelsey before buying the stock, and he asked me $1,400 for the stock as it was. Kelsey said he had one stock horse that he would reserve with the harness; that he would take $200 less for the horse, and, after a day or two jewing, I bought the stock for $1,150, and Kelsey reserved the horse and his harness. I got seven horses in the purchase. * * * I paid Mr. Kelsey $1,150 for the stock, and got the hay and grain that there was in the barn. There was about $50 worth of hay and grain in the barn."

The witness McFadden testified for plaintiff:

"That somewhere between the 21st day of January and the 12th day of February, 1908, as near as I could look it up since this thing came up, I attempted to buy this livery stock or Mr. Kelsey and I offered Mr. Kelsey $1,300 in cash for it. I had the cash with me. At first he offered to take that. In about a week I came back, and Kelsey said his boy was coming in there with him, and he would not sell it."

Defendant testified that prior to the sale to Osborne he had sold property to the amount of $180, making, with the horse reserved, $1,480. Plaintiff testified that there were three horses not turned over to defendant:

"The first horse was a bay mare, I believe I have forgotten the name, weight about 950 to 1,000 pounds, about 12 or 15 years old, a very good one. That was killed.

The value of the horse was probably $150 or better. Mr. Kelsey received for that horse $100, so he said. Gave credit on the note and mortgage. The second horse called 'Bill' became lame and was sold for $35, while witness was at the barn. That was all that could be obtained for the horse. The third horse was a chestnut saddle horse. It died in the barn. Witness thought a fellow offered him $25 before it died. That was a fair price for the horse at the time.

"*Plaintiff's Counsel:* Were there any other articles that you purchased that you did not turn over to Mr. Kelsey at the time of this arrangement?

"*A.* I am not positive. There might have been one old buggy or two old buggies that were not there. That is all I could recall that was absent from the stock. The value of these buggies would not exceed $15 each or $30 for both. That is my memory. I am not positive but what I turned them over to Mr. Kelsey."

Defendant testified that the full market value of all the property received from Mulholland except the horses was $291, that the value of the horses averaged $40 each, and that there were 11 horses turned over to witness. Defendant's testimony and that of his witnesses tended to show that when he took the stock it was badly run down and depreciated. Although the jury appears to us to have placed a very high value upon the stock, we cannot, in view of the admissions of the defendant as testified to by plaintiff's witnesses, say that there was no evidence of the value of the stock when it was delivered to defendant.

We are of the opinion, however, that the court erred in overruling defendant's objections to questions put to the witness Miller as to the comparative value of the stock at the time Mulholland took it and at the time Kelsey took it. The witness was asked:

"*Q.* Did you at the time know the values of livery stock like this was?

"*A.* Why, no; not exactly.

"*Q.* You have seen horses sold and bought?

"*A.* Horses sold and bought.

"*Q.* And you have seen harnesses and carriages bought and sold?

"*A.* Yes, sir.

"*Q.* And had some experience in them?

"*A.* Sure, some.

"*Q.* And know what they ought to bring?

"*A.* What they ought to have brought; yes, sir.

"*Q.* Now, I ask you how much more was that worth at the time Mr. Mulholland turned it over to Mr. Kelsey than it was when he got it in December, 1906? * * *

"*Q.* You may state how much more it was then worth?

"*A.* Well, I should think it was worth three to four hundred dollars more."

The stock comprised many other articles besides horses and carriages, and the witness' competency was rather disproved than proved by his own testimony. We also think it was erroneous to receive testimony as to the profits of the business while defendant was running it, since, although this might have some bearing upon the character of the property producing the profits, it would be too uncertain and speculative to afford more than a conjecture as to the value of the property.

The other questions discussed will probably not arise upon another trial, and we therefore do not consider them.

The judgment is reversed, and a new trial granted.

MOORE, McALVAY, BROOKE, and STONE, JJ., concurred.